KEVIN THOMAS REYNOLDS, a Minor, by Barbara Reynolds, His Mother and Next Friend, *et al.*, Plaintiffs-Appellants, v. DECATUR MEMORIAL HOSPITAL *et al.*, Defendants (Thomas Fulbright, Defendant-Appellee).

Fourth District   No. 4—95—0562

Argued December 12, 1995.—Opinion filed January 4, 1996.

John J. Lowrey (argued), of Lowrey & Smerz, Ltd., of Chicago, for appellants.

Garry E. Davis (argued), of Erickson, Davis, Murphy, Johnson, Griffith &

Walsh, of Decatur, and Robert Marc Chemers and Anne Scheitlin Johnson, both of Pretzel & Stouffer, Chartered, of Chicago, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs Kevin Thomas Reynolds, a minor (born July 14, 1988), by Barbara Reynolds, his mother and next friend, and Charles W. and Barbara Reynolds, individually, appeal from a summary judgment entered by the circuit court of Macon County in favor of defendant Dr. Thomas Fulbright in this medical malpractice action based on a negligence theory. Although this case remains pending as to other defendants, the trial court made a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) and this appeal ensued.

The only issue is whether, as a matter of law, a telephone conference between treating pediatrician Dr. Sharon Bonds and Fulbright concerning Kevin's condition created a physician-patient relationship between Kevin and Fulbright so as to raise a duty which is enforceable in a medical malpractice action in light of the standards of protocol of the hospital at which Kevin was being treated and in which both physicians were allowed to practice. The trial court found there was no physician-patient relationship and, therefore, no duty was owed by Fulbright to plaintiffs. We affirm.

Taken with the case was defendant's motion to strike the statement of facts in plaintiffs' brief. The plaintiffs have filed an objection to the motion.

■ The statement of facts in the plaintiffs' brief appears to be an attempt to appeal to the sympathy of the members of this court in favor of plaintiffs. The respondent's objection to this has merit. The statement of facts is not presented fairly without argument or comment, a violation of Supreme Court Rule 341(e)(6) (155 Ill. 2d R. 341(e)(6)). Nevertheless, the motion to strike the entire statement of facts is denied. The parties are assured that this court has considered only those relevant facts which appear of record in rendering a decision in this case.

Plaintiffs claim Kevin's quadriplegia resulted from the medical malpractice of defendants. The facts relevant to this appeal appear undisputed, although the legal consequences of those facts are in dispute.

At about 10:45 p.m. on November 29, 1990, Kevin was seen in the emergency room of Decatur Memorial Hospital by Dr. Terry Balagna. The history given indicated he was injured at 8:30 or 9 p.m. by falling while jumping on the couch in the family living room. Upon examination, an abnormal breathing pattern was observed. Tests were conducted to discover the possibility of an infection or an

electrolyte or metabolic problem. Cervical spine X rays were taken at about 1:05 a.m. which appeared normal. Nevertheless, Kevin was admitted to the hospital. Balagna called Bonds, a pediatrician, to examine him.

Bonds arrived at the hospital at about 1:45 a.m. on November 30, 1990. At that time, Kevin's temperature was 102 degrees Fahrenheit. Bonds made a quick assessment of plaintiff and took a history from Barbara, which indicated Kevin had jumped off the couch, landed on his arm, walked to his mother, and gradually become limp after that. Bond noticed the child's breathing difficulties and that he was flaccid. She reviewed the emergency room records and X-ray reports, conducted reflex tests, and noticed he was moving his head. His neck was not tender. Among the possible reasons for his condition which Bonds considered were neurologic, traumatic, metabolic, infectious, or post-infectious problems. Because of the fever, she was leaning toward the infectious process diagnosis, and she did not consider a spinal cord injury. A history of a two-foot fall with a normal $2^1/_2$-year-old child did not indicate to her the existence of a cervical cord injury from trauma.

At 2:05 a.m., Bonds telephoned Fulbright at his home. She advised Fulbright that Kevin walked following the fall, he had an elevated temperature and was flaccid and responsive, and the cervical spine X rays were negative. She probably told him the child was flaccid from the neck down, including all four extremities. Fulbright inquired if the child had a stiff neck. Bonds said she did not know, went to check Kevin's neck, and returned to inform Fulbright that his neck was stiff. At the end of the conversation, Fulbright suggested a spinal tap to determine whether meningitis, encephalitis, or something similar was involved. Bonds did not ask Fulbright to treat Kevin, nor did Fulbright commit himself to further involvement with Kevin. Bonds was under the impression that Fulbright would see Kevin if she contacted him and requested that he treat Kevin.

Fulbright's recollection of his telephone conversation was as follows:

> "Dr. Bonds called me regarding Kevin Reynolds. She related to me that the patient had presented with a history of a fall, I believe from a couch. The height estimated to be less than two feet. She related that the child was listless, and that the child was febrile with a fever of—on the order of 102 degrees Fahrenheit.
>
> I questioned Dr. Bonds regarding the history. My first concern was the veracity of the history. My major concern here was the question of child abuse. There was some report on her part that the history had been somewhat inconsistent. That in itself is a

hallmark of abuse. I questioned her specifically as to whether or not she felt abuse was operative in this case. She stated relatively emphatically that she did not think that it was.

She did not think that the fall was overly significant because of it's [sic] apparently benign nature, that is, a fall from a low height of a young child as happens to every young child.

The question of the cause of the fever and the possible neurological causes of the fever was raised. The question of meningitis was discussed. The question of an ascending neuritis was discussed. The performance of a lumbar puncture was discussed. The conclusion was that Dr. Bonds would perform the lumbar puncture and let me know if she wanted me to see the child thereafter. I offered to make myself physically available if she wished. We elected to proceed with the plan of her performing the lumbar puncture and letting me know if she needed me there."

Fulbright often received informal inquiries from other doctors asking questions and seeking suggestions. These inquiries do not include a request to see a patient, review a patient, or render an opinion, but only to discuss the case. He considered this a courtesy service for which he did not bill. He offered to make himself available because the other physician may be inhibited about asking him to see the patient due to the late hour or the marginal neurosurgical nature of the case.

At 3:30 a.m. on November 30, 1990, Bonds performed the spinal tap. Before leaving the hospital, she told a nurse to write an order in Kevin's chart "to consult with Fulbright to see in early a.m." That note was posted to the chart, and the message was taken off the chart at 4:05 a.m. The usual practice was for the ward clerk or nurse to notify the operator, who would place the message in the appropriate area. The message was never received by Fulbright. At 8 a.m., Bonds realized Fulbright had not received the message, attempted to locate him, and was told he was in surgery performing a very long procedure. Fulbright stated he did not receive another call from Bonds or anyone else at the hospital with regard to Kevin's condition or treatment. Kevin's family never asked Fulbright to treat Kevin, and he never saw, examined, or came to a diagnosis as to Kevin's condition. Fulbright did not bill for any services to Kevin.

When Kevin was transferred to St. John's Hospital (St. John's) at 12 p.m. on November 30, 1990, Bonds' diagnosis was an infectious process called Guillain-Barré syndrome. At St. John's, a spinal cord injury was diagnosed.

According to the affidavit of Dr. John Oldershaw, a neurosurgeon, the medical staff rules of Decatur Memorial Hospital relating to consultations state:

"4.1 Appropriate consultation shall be obtained by practitioners in cases in which the patient is not a good medical or surgical risk and in cases in which the diagnosis is obscure, where there is doubt as to the best therapeutic measure to be utilized, or where the treatment is difficult and especially in cases with probable disorders or complications lying within a field other than the one in which the attending physician is primarily qualified.

4.2 A consultant must be well qualified to give an opinion in the field where his opinion is sought. A satisfactory consultation must include the examination of the patient and the record. A written opinion signed by the consultant must be included in the medical record. When operations are involved, the consultation note, except in emergency, shall be recorded prior to the operation."

According to Oldershaw, the failure of Fulbright to examine Kevin and the records before making a recommendation and failing to follow through after being consulted violated the hospital rules and generally accepted standards of practice in the medical community.

"Summary judgment is appropriate when the pleadings, depositions and affidavits, construed most strongly against the movant and most liberally in favor of the opponent, present no genuine issue of material fact and show that judgment should be granted as a matter of law. (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417.) The purpose of summary judgment is not to try a question of fact but to determine whether one exists. (*Mitchell v. Jewel Food Stores* (1990), 142 Ill. 2d 152.)" *Golla v. General Motors Corp.* (1995), 167 Ill. 2d 353, 358.

"The determination of whether a duty exists—whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is an issue of law to be determined by the court." *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 525, 513 N.E.2d 387, 396.

■ Where a question of law is determinative of a case, summary judgment is a proper remedy. (*National Underground Construction Co. v. E.A. Cox Co.* (1991), 216 Ill. App. 3d 130, 134, 576 N.E.2d 283, 286 (construction of a contract as a matter of law).) Even if the question presented would ordinarily be a question of fact, if only one conclusion may be drawn from the undisputed facts, then a question of law is presented which may be appropriately dispensed with by summary judgment. (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171, 421 N.E.2d 864, 868-69.) On review, this court considers *de novo* the propriety of granting the summary judgment. *Golla v. General Motors Corp.* (1994), 261 Ill. App. 3d 143, 147, 633 N.E.2d 193, 196, *aff'd* (1995), 167 Ill. 2d 353.

■ In a negligence action for medical malpractice, there must be a duty owed by defendant to the plaintiff, a breach of duty, an injury proximately caused by the breach, and resultant damages. (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 476, 483 N.E.2d 711, 717.) The determination of whether the parties stood in such a relationship to one another that the law would impose on defendant a duty of reasonable conduct for the benefit of the plaintiff is a question of law. That policy determination is based on consideration of the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant. (*Kirk*, 117 Ill. 2d at 525-26, 513 N.E.2d at 395-96.) A physician's duty is limited to those situations in which a direct physician-patient relationship exists or there is a special relationship such as when an infant sues for prenatal injuries foreseeably caused by the physician's negligent care of the mother prior to conception. (*Kirk*, 117 Ill. 2d at 531, 513 N.E.2d at 399; *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 357, 367 N.E.2d 1250, 1255.) In this case, there was no special relationship as in *Renslow*, and there was no direct physician-patient relationship, and hence no duty owed to plaintiffs by Fulbright. This determination was properly made as a matter of law.

■ The relationship of physician and patient is one of trust and confidence. It is a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient. (70 C.J.S. *Physicians and Surgeons* § 58, at 448 (1987).) A consensual relationship can exist where other persons contact the physician on behalf of the patient, but this is not a case in which Fulbright was asked to provide a service for Kevin, conduct laboratory tests, or review test results. Fulbright did nothing more than answer an inquiry from a colleague. He was not contacted again and he charged no fee. A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed. (*Lopez v. Aziz* (Tex. Ct. App. 1993), 852 S.W.2d 303, 306; see *Flynn v. Bausch* (1991), 238 Neb. 61, 66, 469 N.W.2d 125, 128-29; *Hill v. Kokosky* (1990), 186 Mich. App. 300, 304, 463 N.W.2d 265, 267; *Ingber v. Kandler* (1987), 128 A.D.2d 591, 592, 513 N.Y.S.2d 11, 11 (memorandum decision); *Oliver v. Brock* (Ala. 1976), 342 So. 2d 1, 4.) This is not a case in which Fulbright had accepted a referral of the patient. (See *Davis v. Weiskopf* (1982), 108 Ill. App. 3d 505, 511-13, 439 N.E.2d 60, 64-65.) Nor is this a case in which a physician undertook to direct the actions of hospital employees in a telephone conversation with an emergency room nurse. See *Wheeler v. Yettie Kersting Memorial Hospital* (Tex. Ct. App. 1993), 866 S.W.2d 32, 39-40.

The affidavit of Oldershaw does not help plaintiffs. Whether Fulbright owed a duty to Bonds, and ultimately to plaintiffs, is a question of law, not a question of medicine. The proffered opinion of plaintiffs' expert transcends the bounds of his competence and intrudes on the exclusive province of the court. Plaintiffs may not, in the guise of offering expert medical opinion, arrogate to themselves a judicial function and obviate a ruling on the existence of or extent of a legal duty which might be owed by a physician to a patient. *Sawh v. Schoen* (1995), 215 A.D.2d 291, 292, 627 N.Y.S.2d 7, 9 (memorandum decision).

For the same reasons, the rules of Decatur Memorial Hospital are not dispositive of this case. Such rules are more appropriately considered in determining whether the standard of care was met. (See *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 331-32, 211 N.E.2d 253, 257.) Such considerations only arise after a physician-patient relationship imposing a duty has been found to exist.

Plaintiffs also argue that, since the telephone conversation breached the hospital rules, Fulbright breached his contract with Decatur Memorial Hospital. Plaintiffs' complaint in this case did not present a theory of recovery on behalf of plaintiffs as third-party beneficiary of any contract between the hospital and Fulbright. This issue is not presented by the pleadings.

Distinguishable from this case is plaintiffs' cited case of *Hiser v. Randolph* (App. 1980), 126 Ariz. 608, 617 P.2d 774, which involved the question of whether a physician under contract to a hospital to render emergency room services had a duty to render care to anyone presenting themselves to the hospital for emergency care. In *Hiser*, the court found that the contractual relationship between a hospital and the doctor obligated the doctor to treat such patients. (*Hiser*, 126 Ariz. at 612, 617 P.2d at 778.) The rules of Decatur Memorial Hospital in this case cannot, as a matter of law, require a physician to enter into a physician-patient relationship with every person treated in the hospital whose treating physician might make an informal inquiry about that case.

Plaintiffs suggest that what needs to be done is to find a physician-patient relationship to result from every such conversation. The consequence of such a rule would be significant. It would have a chilling effect upon the practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient. The likely effect in adopting plaintiffs' argument also would be that such informal conferences would no longer occur. To reiterate, this would inhibit the exchange of information

and expertise among physicians and would not benefit the medical profession or persons seeking treatment. *Lopez*, 852 S.W.2d at 307.

Agreeing with the trial court that there was no physician-patient relationship between plaintiffs and Fulbright, and therefore no duty owed by Fulbright to plaintiffs, the summary judgment of the circuit court of Macon County is affirmed.

Affirmed.

GREEN and STEIGMANN, JJ., concur.